UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Insight Technology Inc.

v.                                    Civil No. 04-cv-074-JD

SureFire, LLC


Insight Technology Inc.

                                      Civil No. 03-cv-253-JD

v.

Glock Ges.M.B.H. and Glock, Inc.


O R D E R

Insight Technology Inc. brings a patent infringement action against SureFire, LLC, in one suit and against Glock Ges.M.B.H., and Glock, Inc., in a separate suit, alleging infringement of Insight's United States Patent Number 6,574,901 ("'901 patent"). The cases have been consolidated for the limited purpose of claim construction. The parties filed a joint stipulation on claim construction in which they agreed to the meaning of certain terms, listed the terms on which they disagree, and agreed that the remaining limitations of the asserted claims in the patent do not require construction.[1]

_____

[1]With respect to the terms on which they disagreed, in some instances one or more but not all of the parties thought that the term did not require construction at all so that their disagreement was not necessarily about the proposed construction.

In the stipulation, Insight stated that it believed a
Markman hearing would assist the court, while SureFire and Glock
stated that a hearing was not necessary, unless the court
concluded otherwise.[2]  A Markman hearing provides an opportunity
for the parties to present and for the court to consider
extrinsic evidence, such as expert testimony, pertinent to claim
construction, but a hearing is not required.  Ballard Med. Prods.
v. Allegiance Healthcare Corp., 268 F.3d 1352, 1358 (Fed. Cir.
2001).  If a hearing is held, however, the evidence presented is
to be considered only for the limited purpose of educating the
court in understanding complex technology involved in the patent.
Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1372 (Fed. Cir.
2003); EMI Group N. Am., Inc. v. Intel Corp., 157 F.3d 887, 892
(Fed. Cir. 1998).  The parties in this case have presented a
sufficient record to permit claim construction without a hearing.

The '901 patent is titled "Auxiliary Device for a Weapon and
Attachment Thereof."  The field of the invention is described as
relating generally "to an auxiliary (e.g. illumination) device
for a weapon and, more particularly, to attaching an auxiliary
device to a weapon."  1:13-15.  The patent includes thirty-five
claims, with claims 1 and 32 being independent claims and the
remaining claims being dependent on either claim 1 or claim 32.

_____

[2]See Markman v. Westview Instruments, Inc., 517 U.S. 370
(1996).

Insight has not indicated, either in its complaints or in the current briefing on claim construction, which claims of the '901 patent, specifically, it alleges the defendants have infringed or are infringing.[3]  The parties have addressed claim construction for terms used in claims 1, 2, 4, 5, 10, 11, 12, 13, 16, 17, 21, 22, 23, 27, 31, 32, 34, and 35.

Discussion

Claim construction presents a legal question as to the meaning of disputed terms used in patent claims.  Pfizer, Inc. v. Teva Pharms., USA, Inc., 429 F.3d 1364, 1373 (Fed. Cir. 2005). Claims are interpreted from the point of view of a person of ordinary skill in the field of the invention and at the time of the invention, who is deemed to read the disputed term or terms in the context of the entire patent.  Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005).  In discerning the meaning of a disputed claim, the court considers "the claim language, as it relates to the invention set forth in the written description, the drawings, and where relevant the prosecution history."

---

[3]For purposes of Insight's motion for preliminary injunction against SureFire, Insight "limited" its allegations of infringement to claims 1, 10, 11, and 28.  In its claim construction brief, SureFire states that Insight alleges its "X200 WeaponLight" infringes claims 2, 9, 17, 22, 23 and 28 of the '901 patent.  Glock states in its claim construction brief that Insight alleges that it is infringing claims 2, 9, 17, 22, 23, 27, and 34.

Invitrogen Corp. v. Clontech Labs.,Inc., 429 F.3d 1052, 1076 (Fed. Cir. 2005).

When necessary, the court may also consider extrinsic evidence, which is any evidence that is external to the patent and prosecution history, to explain the field of the invention or underlying technology.  Phillips, 415 F.3d at 1317-18.  The court must, however, use extrinsic evidence only in the context of the intrinsic evidence, the patent itself and prosecution history. Id. at 1319.  Because the specification "is the single best guide to the meaning of a disputed term, . . . the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."[4]  Id. at 1315-16 (internal quotation

---

[4] A patent specification is defined in 35 U.S.C. § 112 as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

"The role of the specification includes presenting a description of the technologic subject matter of the invention, while the role of claims is to point out with particularity the subject

marks omitted); <u>accord</u> <u>nCube Corp. v. Seachange Int'l, Inc.</u>, ---
F.3d ---, 2006 WL 39053, at *9  (Fed. Cir. Jan. 9, 2006).

As presented in their joint stipulation, the parties agree
to the meaning of certain terms used in the '901 patent claims
and have provided their agreed constructions of those terms.
They will be held to those stipulated constructions for all
purposes in these cases.  They do not agree about the
construction of the following terms:  "extending upward from a
. . . side of the housing," "spring-biased mechanism," "biased in
a direction normal to the top surface of the housing," "extending
across and along," "a top surface of the housing," "illuminator,"
"bar," "relative sliding movement between the auxiliary device
and the weapon causes the inclined surface to cause the latching
mechanism to overcome the biasing force of the spring-biased
mechanism," "biased to move in a direction normal to the top
surface of the housing," "length," and "extending along at least
a portion of a length of the . . . side of the housing."  The
disputed terms are construed as follows, beginning with the least
disputed terms.

---

matter that is patented.  The claims are directed to the
invention that is described in the specification; they do not
have meaning removed from the context from which they arose."
<u>Netword, LLC v. Centraal Corp.</u>, 242 F.3d 1347, 1352 (Fed. Cir.
2001) (internal citation omitted).

A.   "Length"

Insight states that it now agrees with Glock that "length" means "the measurement or extent of something along its greatest dimension."  Glock states in the appendix to its response brief that it did not offer that construction.  Instead, Glock asserts that no construction is required but does not indicate whether the construction proposed by Insight is appropriate.  SureFire also states that the meaning is clear and does not require construction.

"Length" is used only in claims 1 and 32.  There, "length" is part of the description of the housing of the auxiliary device which has two "structural members" that extend upward and extend "along at least a portion of a length" of the side of the housing.  In addition, the structural members "are substantially parallel to a central, longitudinal axis extending along a length of the housing."  As used in the claims, "length" refers to a longitudinal dimension, meaning in the direction of the long axis of the body.

B.   "Illuminator"

Insight defines "illuminator," as used in claims 2, 4, 16, 31, 34, and 35, in the way it is defined in the specification: "a device generally used to cast light upon a target area or a portion thereof."  6:9-10.  SureFire and Glock contend that no

6

construction is necessary, meaning that the term "illuminator" as used in the claims would have its ordinary meaning as understood by those who are skilled in field of the invention.  The court adopts the definition provided in the specification.

C.  "Bar"

Insight contends that the term "bar," as used in claims 11, 12, 13, 17, 21, and 22, has its "plain and ordinary meaning" being "a length of solid material."  Glock contends that "bar" as used in the patent has a clear and well-understood meaning to those skilled in the art.  SureFire defines "bar" with reference to The American Heritage Dictionary of the English Language (4th ed. 2000) as "a relatively long, straight, rigid piece of solid material."

As used in the claims, "bar" is "a spring-loaded bar," which in claim 12 includes an "end portion," and in claim 22 "includes first and second end portions."  The bar is described in one embodiment as having "a geometry that is complimentary to elongate transverse slot."  6:46-47.  The bar may be long enough to extend substantially across the width of the auxiliary device and protrude through an opening, and it must be sufficiently solid or rigid to bias in response to force.  6:47-55.  Based on the parties' submissions and the use of "bar" in the patent, it is construed to mean a piece of solid material with one or two ends and with sufficient rigidity to bias in response to force.

7

D.   "Positioning Mechanism" and "Positioning Member"

The parties agreed that "positioning member," which is used in claim 10, means "a structure that positions the auxiliary device relative to the weapon."  They state in their stipulation that they disagree about the construction of "positioning mechanism" as used in claims 5 and 21.  In their submissions on claim construction, Insight and SureFire agree that "positioning mechanism" and "positioning member" should be construed to have the same meaning.  Glock contends that no construction is necessary.  To avoid any confusion or inconsistency between the terms, both terms are construed to have the same agreed meaning.

E.   "Spring-Biased Mechanism"

The term "spring-biased mechanism" is used in the independent claims, 1 and 32.  Insight contends that the important meaning is that the spring is forcing or biasing another part or mechanism.  Glock contends that the term means a system of parts that includes a spring "which exerts force on at least one of the other parts."  SureFire contends that the term does not need to be construed because it is clear to one skilled in the art.

Based on the interpretations proposed by Insight and Glock, they appear to agree that a spring-biased mechanism means the mechanism is in its forced state.  Consonant with the terminology used in construing "positioning mechanism," "spring-biased

8

mechanism" is a structure that includes a spring which is exerting force on at least one other part of the structure.

F. "<u>Biased in a Direction Normal to the Top Surface of the Housing" and "Biased to Move in a Direction Normal to the Top Surface of the Housing</u>"

These terms are used in claims 1, 23, and 32.  While SureFire does not believe a construction of these terms is necessary, Glock and Insight offer constructions that explain what a "direction normal to the top surface" means.  They agree that a normal direction in this context is perpendicular to the top surface of the housing.  Insight adds that the direction is upward and also adds that a perfect ninety degree angle is not required for the direction to be perpendicular.

Because relative orientation is disputed in the context of other terms, that issue will not be resolved here.  The court agrees with Insight that a normal direction, in this context, means the direction that will make the biasing mechanism work, which is a perpendicular direction, but does not require a specific angle of perpendicularity.  These terms are construed to mean: forced by a biasing spring or biased in a direction that is perpendicular to the top surface of the housing and forced to move, by a biasing spring, in a direction that is perpendicular to the top surface of the housing, although no specific angle of perpendicularity is required.

G. "<u>A Top Surface of the Housing</u>" and "<u>Extending Upward from a</u>
   <u>. . . Side of the Housing</u>"

        According to the parties' stipulation, these terms are used
in claims 1 and 32.  The term "top surface of the housing" is
also used in claim 23.  Insight and SureFire dispute the meaning
of the terms.  Glock initially stated that these terms do not
require construction but later joined SureFire in opposing
Insight's construction.

        Insight contends that "a top surface of the housing" means
"a surface that is exposed in an upward direction and is on top
of the housing when it is oriented in its normal or typical
operating orientation."  Insight interprets "extending upward
from a side of the housing" to mean that the structural members
of the housing must extend upward, as upward is usually
understood, with reference to the usual orientation of the weapon
and the housing.  SureFire apparently concedes that Insight's
construction provides the usual meaning of "top" and "upward" but
contends that those skilled in the art would disregard the usual
meanings and instead would find any directional meaning in the
terms.  SureFire asserts that those skilled in the art would
understand directional words, such as "top" or "upward," "to
relate to specific orientations between parts of a device," so
that changing the position of the device "does not change the
relationship between the elements of the device."  SureFire
argues that those skilled in the art would understand "upward" in

this context to mean "extending away from . . . a side of the housing in a direction normal to the surface of the housing."

To make that theory persuasive, SureFire must show that one skilled in the art would give directional words the meaning it asserts rather than the more ordinary meaning in common usage. See LizardTech, Inc. v. Earth Res. Mapping, Inc., 424 F.3d 1336, 1342 (Fed. Cir. 2005).  The only support for the theory SureFire offers is its interpretation of the deposition testimony of Insight's owner and one of the inventors of the '901 patented device, Kenneth Solinsky.[5]

In the part of the deposition cited by SureFire, Solinsky was not asked what one skilled in the art would understand directional terms to mean.  Instead, SureFire's counsel asked Solinsky whether a device installed on top of the barrel of a weapon, rather than underneath the barrel, would infringe the '901 patent.  Solinsky answered that he would have to think about that before answering, that it would depend on the "normal orientation of the device," and then reluctantly said that the

_____

[5]SureFire states in its construction memorandum and reply that directional phrases would not have their ordinary meaning to one skilled in the mechanical arts, which would include trained mechanical design engineers, engineering technicians, design draftsmen, and those who have developed a basic mechanical aptitude.  Despite the broad category described of those skilled in the art, SureFire did not provide a single affidavit from one skilled in the art to support its theory.  Instead, SureFire offers the argument of counsel as to how weapons are used and how the terms are understood.  Such argument without proper support is not persuasive.

11

specific device they were examining would infringe.

SureFire contends that Solinsky's opinion supports its construction of the terms "upward" and "top." Specifically, SureFire argues that Solinsky's infringement opinion means that one skilled in the art, like Solinsky, would understand that the directional terms in the patent do not have their common meaning because, based on that opinion, a device with structural members extending down from the device to the weapon would nevertheless be infringing. Solinsky's opinion, noting the "normal orientation of the device" and that a device could be turned "upside down," does not demonstrate that one skilled in the art understands such directional terms in a different light than their ordinary meanings. The court also does not find SureFire's argument persuasive in light of the explanations and the use of directional terms in the specification.

The specification describes some of the embodiments of the auxiliary device without a specific reference to direction. In one embodiment, the auxiliary device includes a housing with mounting members that extend "therefrom." 3:67. In another embodiment, the housing "is provided with structural members that extend from or form part of the housing." 4:64-5. In addition, the specification uses directional terms in other contexts with their common and ordinary meanings, as in the reference to the bottom of the weapon frame when describing the workings of the spring-biased mechanism and the location of the side rails

"forward" of the trigger guard.  4:51–52 & 4:62.

The drawings all show the weapon in its expected upright position and the attachment mechanism oriented in the same directional framework.  In describing the embodiment shown in figure 7, the specification explains that figure 7 shows a hollow housing to allow the gun frame to go through the housing, with the auxiliary device positioned "above the weapon frame," which is what the drawing shows.  10:17.  The specification further explains that alternative designs for the auxiliary device are possible in which the device would be positioned on top of the weapon frame or on top of the barrel with the spring-biased mechanism located "on top of the weapon frame or on top of the barrel."  10:22–23.

Claims 1 and 32 are limited to an auxiliary device with a housing designed to have a structural member "extending upward from a first side" and "a second structural member extending upward from a second side."  10:54–57 & 12:43–46.  The spring-biased mechanism is located on "a top surface of the housing."  10:67 & 12:56.

Taking those terms in the context of the patent as a whole and lacking any persuasive evidence to the contrary, the directional terms used in the patent have their ordinary meanings.  The phrase "extending upward" means upward from the housing toward the weapon above the housing, with the weapon in its expected position as shown in the drawings.  The top of the

13

housing means the top with reference to the housing in its
position under the weapon, again, with the weapon in its expected
position as shown in the drawings.

H. "Relative Sliding Movement Between the Auxiliary Device and
   Weapon Causes the Inclined Surface to Cause the Latching
   Mechanism to Overcome the Biasing Force of the Spring-Biased
   Mechanism"

    The quoted phrase is used only in claim 27.  Insight
proposes a construction for the phrase, while Glock and SureFire
contend that no construction is required.  Insight states that
the phrase means "that the spring-biased mechanism include[s] an
inclined surface, such as depicted in the patent's Figure 6, []
that is configured so that when the auxiliary device slides onto
the weapon, the sliding motion of the weapon causes the sloped
surface to be pushed against the biasing force of the spring that
biases the spring-biased mechanism."  Neither Glock nor SureFire
have responded to Insight's proposed construction.

    Claim 27 is dependent on claim 24, which claims the
auxiliary device of claim 1 in the circumstance when the "spring-
biased mechanism comprises a latching mechanism."  Claim 27
provides a specific form of latching mechanism, using an inclined
surface as part of the spring-biased mechanism.  The distinction
appears to be that the inclined surface of the spring-biased
mechanism "facilitates the installation of the auxiliary device

14

on the weapon." 8:21-22.  In other words, the inclined surface
causes an "automatic retraction as the auxiliary device is slid
onto the weapon [that] simplifies installation, as it eliminates
the need to manually retract the transverse bar as the auxiliary
device is being installed." 8:34-38.  Therefore, the
specification provides sufficient additional description of the
invention claimed in claim 27 so that additional construction is
not necessary.

I. "<u>Extending Across and Along</u>" and "<u>Extends [Extending] Along At
   Least a Portion of a Length of the . . . Side of the Housing</u>"

     Insight and Glock dispute the meaning of "extending along"
and "extends along" as used in phrases in claims 1 and 32.  In
both claims, the first structural member of the housing for the
auxiliary device is described as "extending upward from a first
side of the housing and <u>extending along at least a portion of a
length of the first side of the housing</u>."  The second structural
member "<u>extends along at least a portion of a length of the
second side of the housing</u> such that it is substantially parallel
to the first structural member, and wherein both the first and
second structural members are substantially parallel to a
central, longitudinal axis extending along a length of the
housing."  The spring-biased mechanism is described as "<u>extending
across and along</u> a top surface of the housing."  SureFire states
that "the ordinary meaning of this term to a person of ordinary

15

skill in the art is clear and does not require any construction by the Court." SureFire does not, however, articulate the clear meaning that it perceives.

### 1. Parties' constructions.

Glock and Insight concur that "extending across" as used in the disputed phrase to describe the spring mechanism means extending or spanning from one side of the top surface of the housing to the other. Put more simply, "extending across" means that the mechanism traverses or is perpendicular to the longitudinal axis of the housing. The parties agree that longitudinal means the long axis of the body. To the extent there is disagreement about whether "extending across" requires the mechanism to cover the entire distance from one side of the housing to the other, the phrase is construed to mean the orientation but not necessarily the size of the mechanism.[6]

Glock contends that "extending along at least a portion of a length of the . . . side of the housing" should be construed to

---

[6]Glock's argument that "extending across" should be construed to mean the entire width of the housing is contradicted by the portion of the specification it cites. Glock argues that because the patent specification describes the embodiments pictured in the figures to have a slot in the weapon frame that is "at least partially across the bottom of the weapon frame," the phrase "extending across," without "partially," means that the bar of the spring mechanism extends completely across the housing. That, of course, would not make sense because the bar must fit into the slot so that it cannot be any bigger than the slot.

mean "spanning over at least a portion of the length (but not necessarily over the entire length) of the side of the housing." Glock contends, however, that "extending along," as used to describe the spring mechanism, means "spanning . . . over the length of (along) the top surface of the housing."  In other words, Glock interprets "along" to mean length.  Glock also contends that "extending along" means covering the entire length of the housing.

In ordinary parlance, "along" does not necessarily incorporate the direction of length.[7]  If Glock's construction of "extending along," which equates "along" with "length" and adds a size requirement, were added to the phrase pertaining to the structural members, it would make that description nonsensical: the structural member would span <u>over the length</u>, meaning the entire length, of at least <u>a portion of a length</u> of a side of the housing.  Glock's two constructions of the same phrase are inconsistent and do not comply with the ordinary meaning of "extending along."

Insight contends that "extending along" as used to claim the

_____

[7]Although "along" is defined to include "the length or direction of," it also means "through, on, beside, [and] over." The Random House Dictionary of the English Language 59 (2d ed. 1987); <u>see</u> <u>also</u> <u>Pfizer</u>, 429 F.3d at 1375.  For example, if one were to say "I am running <u>along</u> the house," that statement would explain the runner's location, that is near or beside the house, but not the direction of the run.  Or, if one were to say "the path extends along the school," that would again provide the location of the path but not necessarily its direction.

spring-biased mechanism means "situated substantially parallel and close to the top surface of the housing."  In other words, Insight construes the term to provide the location, close to the top of the housing, as distinguished from a location within or on the bottom of the housing, but also adds the requirement that the mechanism be parallel to the top of the housing.  Insight uses the same concepts in interpreting the phrase in the context of the structural members:  "the structural members must extend on a line or course substantially parallel and close to the surface of the side of the housing."  The question Insight's interpretation raises is whether "extending along" is properly construed to mean both close to and substantially parallel to the top of the housing.

Both Insight and Glock argue that other parts of the specification support their differing interpretations of the phrase.  Their arguments, however, are not persuasive.  Therefore, the various uses of "extending" and "along" in the specification do not appear to solve or even provide substantial guidance on the appropriate meaning of the word as used in claims 1 and 32.[8]

---

[8]To the extent Glock relies on the magistrate judge's report and recommendation, denying Insight's motion for a preliminary injunction against SureFire, to show that "extending along" means covering the entire length of the top of the housing, its reliance is misplaced.  See, e.g., Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981); Glaxo Group Ltd. v. Apotex, Inc., 376 F.3d 1339, 1346 (Fed. Cir. 2004); Jack Guttman, Inc. v. Kopykake Enters., 302 F.3d 1352, 1361 (Fed. Cir. 2002).  Further, the

The practical effect of the two constructions is to define the scope of claims 1 and 32 with respect to the spring mechanism.  Glock's construction limits the claims to a mechanism using a cantilever spring, which extends down the entire length of the housing.  Insight's construction would cover both a cantilever-spring mechanism and a leaf-spring mechanism, regardless of size.  Therefore, the dispute focuses on the use of the phrase "extending along" to describe the spring mechanism.

2.  Prosecution history.

The parties both point to the prosecution history to support their differing interpretations of the disputed phrase.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."  Phillips, 415 F.3d at 1317.

The patent examiner concluded that Insight's initial application included separate inventions, designated according to the figures as Species A (Figures 4 and 6), Species B (Figure 5), Species C (Figure 3B), and Species D (Figure 7).  He required Insight, "under 35 U.S.C. § 121 to elect a single disclosed species for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be

---

court is not persuaded that Insight's position and the construction found by the magistrate judge there are necessarily inconsistent with the construction offered here.

allowable."[9]  Ex. E at 2.[10]  Insight elected Species A, which
Figures 4 and 6 show to be the embodiment using a cantilevered
spring in the second positioning mechanism, while Species B,
based on Figure 5, used a leaf spring.

After amendment, rejection, and further amendment, the
application included claim 94 that claimed:  "a spring-biased
mechanism oriented substantially perpendicular to the central,
longitudinal axis of the housing along a top surface of the
housing, and wherein the bias of the spring forces the mechanism
to move in a direction normal to the top surface of the housing."
Ex. H at 2.  In response, the examiner again imposed a
restriction requirement, using the same language as quoted above.
Insight again elected Species A and withdrew certain claims.
Insight also amended that part of claim 94 pertaining to the
spring-biased mechanism as follows:  "a spring-biased mechanism
extending across and along a top surface of the housing, and
wherein the spring-biased mechanism is configured to be biased in
a direction normal to the top surface of the housing."  Ex. J at
3.  As approved, claim 94 became claim 1 of the '901 patent.

———————————

[9]Section 121 provides in pertinent part:

If two or more independent and distinct inventions are
claimed in one application, the Director may require
the application to be restricted to one of the
inventions.

[10]Insight's exhibits referenced for the prosecution history
are attached to its claim construction brief filed in <u>Insight v.
Glock</u>, 03-cv-253, doc. no. 48.

Glock contends that by electing Species A, Insight abandoned Species B, the embodiment of the invention that used a leaf-spring mechanism, so that "extending along" is properly interpreted in a way that excludes the leaf spring embodiment. Insight agrees that two elections occurred in the course of the prosecution history but argues that it did not abandon the other embodiments, as shown in the figures of the '901 patent. Insight asserts that claim 1 and claim 32 of the '901 patent are generic and, therefore, overcame the species election as provided in the statement of the patent examiner.

"[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." <u>Phillips</u>, 415 F.3d at 1317. That appears to be the situation in this case. While the prosecution history shows that Insight twice elected Species A over the other species of the invention, including Species B that claimed a leaf spring, the patent examiner left open the possibility that a generic claim would be approved that would cover the non-elected species. The question remains as to whether that occurred.[11]

---

[11]Glock's assertion that no generic claim was allowed because the patent examiner never so stated misses the point. If a generic claim <u>was</u> allowed in the '901 patent, as approved, no further statement is required.

3.   <u>The '901 patent.</u>

The '901 patent describes the generic form of the invention as follows:  "In generic form, the auxiliary device is attached to the weapon frame using a first positioning mechanism and a second positioning mechanism.  The first positioning mechanism preferably comprise [sic] complementary engaging surfaces on the auxiliary device and weapon frame. . . . The second positioning mechanism preferably comprises a device which under normal conditions, sufficiently retains the auxiliary device in a predetermined position relative to the weapon frame."  8:46-50 & 8:63-66.  Claim 1 and claim 32 are not as generic as the form described in the specification in that they include particular elements of the two positioning mechanisms.  Importantly, however, the claims do not specify any particular spring or other biasing mechanism.  Further, neither claim 1 nor claim 32 references Figures 4 and 6 or excludes Figure 5.  Therefore, claims 1 and 32 appear to be generic with respect to the nature of the biasing force used, albeit with the limitations that the spring-biased mechanism extend across and along a top surface of the housing and that the mechanism be biased "in a direction normal to the top surface of the housing."  10:66 - 11:2.

In contrast, claim 25, a dependent claim for a "latching mechanism," is limited explicitly to a cantilevered spring. Dependent claim 24 claims "[t]he auxiliary device of claim 1, wherein the spring-biased mechanism comprises a latching

22

mechanism."  Dependent claim 25 describes "[t]he auxiliary device
of claim 24, wherein the latching mechanism comprises a
cantilevered spring, the cantilevered spring being operable to
bias the latching mechanism into engagement with a complementary
position associated with the weapon."

"The doctrine of claim differentiation creates a presumption
that each claim in a patent has a different scope."  Free Motion
Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1352 (Fed.
Cir. 2005) (internal quotation marks omitted).  That doctrine
provides a limited tool for claim construction, giving force to
the presumption only as long as the resulting construction does
not conflict with a clear meaning provided by the specification.
Curtiss-Wright Flow Control Corp. v. Velan, Inc., --- F.3d ---,
2006 WL 335609 (Fed. Cir. Feb. 15, 2006) (only Westlaw citation
is currently available).  Under the claim differentiation
doctrine, when dependent claims are limited to a particular
meaning or scope, the independent claim is presumed to have a
broader meaning and scope.  Free Motion, 423 F.3d at 1351.  In
the context of this case, because claim 25 is explicitly limited
to a cantilevered spring, presumably claim 1 is not so limited in
scope.

The specification of the '901 patent supports a broader
interpretation of "extending along" than Glock proposes and
undermines the theory that Insight abandoned any species of the
invention that would include the leaf spring in the spring-biased

23

mechanism.  In the specification, the embodiment depicted in
Figure 5 is described as having a second positioning mechanism
that includes "a transverse bar 6 which under the biasing force
of the leaf-spring 60 is preferably securely positioned within an
opening 64 formed in the top of the auxiliary device 10, and held
in place in a suitable manner.  The leaf-spring 60 normally
biases bar 6 upwards and away from recess 64."  7:7-13.
Therefore, Figure 5, a disclosed embodiment of the invention,
includes a leaf spring, which is contrary to Glock's
interpretation of "extending along" in claims 1 and 32.  Further,
the specification states:  "The leaf-spring 60 of the embodiment
of FIG. 5 and the cantilevered spring 70 in the embodiment of
FIG. 6 are but two of many possible biasing mechanisms that may
be used in the embodiments of the invention."  10:31-34.

   "It is [] entirely appropriate for a court, when conducting
claim construction, to rely heavily on the written description
for guidance as to the meaning of the claims."  Phillips, 415
F.3d at 1317.  Further, "[a] claim construction that does not
encompass a disclosed embodiment is rarely, if ever, correct."
Medrad, Inc. v. MRI Devices, Corp., 401 F.3d 1313, 1320 (Fed.
Cir. 2005).  To construe a claim in a way that would eliminate a
disclosed embodiment "'would require highly persuasive
evidentiary support.'"  Johns Hopkins Univ. v. CellPro, Inc., 152
F.3d 1342, 1355 (Fed. Cir. 1998) (quoting Vitronics Corp. v.
Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996)).  Glock

24

falls far short of providing highly persuasive support for its interpretation of the disputed phrases, which interpretation would eliminate the embodiment described in the specification as depicted in Figure 5.

    4.  <u>Construction.</u>

Therefore, "extending along"  must be construed in a way that would also claim a leaf spring as part of the spring-biased mechanism.  The parties appear to agree that Glock's construction would exclude a leaf-spring embodiment.  Insight's proposed construction would encompass the leaf-spring embodiment but imposes the additional requirement of parallelism, which is not evident in the claim language.

With respect to the use of "extending along" and "extends along" to describe the structural members of the housing, the terms provide the location of those structures with reference to the housing.  That is, the two structures are located on either side of the housing, opposite each other and substantially parallel to each other, and span at least part of the length of the side of the housing.  Similarly with respect to the spring-biased mechanism, "extending across and along a top surface of the housing" means that the mechanism both traverses the housing and is located on the top of the housing, although not

necessarily in direct contact with the surface of the housing.[12]

## Conclusion

With the disputed phrases construed, the parties would be well advised to undertake a realistic review of the infringement allegations and the defendants' counterclaims.

The court will require the parties to mediate prior to trial if they are unable to reach a settlement on their own.  The court suggests that the parties consider mediation with Attorney David Plant, an experienced mediator in intellectual property disputes. His name appears on the mediation panel list found on the court's website at www.nhd.uscourts.gov/cp/mediation.  A complete copy of his resume is attached hereto.

SO ORDERED.

_Joseph A. DiClerico, Jr._
Joseph A. DiClerico, Jr.
United States District Judge

February 28, 2006

cc:  Thomas A. Brown, Esquire
     Laura L. Carroll, Esquire

---

[12]This interpretation is reinforced by the original version of claims 1 and 32.  Claim 94 described a spring-biased mechanism "oriented substantially perpendicular to the central longitudinal axis of the housing along a top surface of the housing."  In claims 1 and 32, "oriented substantially perpendicular" was changed to "extending across," suggesting that term sets a transverse orientation while "extending along a top surface" was retained with the same meaning, setting the location on the top surface of the housing.

26

Gary A. Clark, Esquire
Jonathan Hangartner, Esquire
Lawrence K. Kolodney, Esquire
Jennifer Rood, Esquire
Craig R. Smith, Esquire
Daniel E. Will, Esquire
Irvin D. Gordon, Equire
John M. Lambros, Esquire
Thomas C. Lundin, Jr., Esquire
George R. Moore, Esquire
John Renzulli, Esquire